**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

FRIENDS OF ANIMALS,

       Plaintiff,

   v.

WILLIAM PERRY PENDLEY, in his official
capacity as the Deputy Director of the United
States Bureau of Land Management, and THE
UNITED STATES BUREAU OF LAND
MANAGEMENT

       Defendants.

</td><td>

Civil Action No. 19-3506 (CKK)

</td></tr>
</table>

**MEMORANDUM OPINION**
(February 28, 2021)

     The Secretary of the Interior and the United States Bureau of Land Management ("BLM") are responsible for managing wild horse and burro populations on public lands throughout the country.  In this case, the animal-rights organization Friends of Animals ("Plaintiff") argues that BLM exceeded the bounds of its authority when managing these animals.  Plaintiff specifically challenges two distinct BLM actions: a 2019 BLM instruction memorandum (the "2019 Instruction Memorandum") and a 2019 BLM decision to remove wild horses and burros over a ten-year period from the Twin Peaks Herd Management Area, a range along the California-Nevada border (the "2019 Gather Plan").  Based on the record before the Court and publicly available information, BLM has not yet carried out or scheduled any animal round ups under the 2019 Gather Plan, as of the present date.

     Plaintiff's complaint raises seven counts.  In Counts I, II, III, IV, and V, Plaintiff challenges the 2019 Gather Plan by asserting that the plan violates both the Wild Free-Roaming Horses and Burros Act ("WHBA") and the National Environmental Policy Act ("NEPA").  In Counts VI and

VII, Plaintiff challenges the 2019 Instruction Memorandum, arguing that BLM issued the instruction memorandum in violation of the Administrative Procedure Act ("APA").  Now pending before the Court is Plaintiff's motion for summary judgment, seeking judgment on each of these seven counts.  Also pending before the Court is Defendants' cross-motion for summary judgment, which requests judgment in favor of Defendants on each of Plaintiff's seven counts.

Upon consideration of the briefing, the relevant authorities, and the record as a whole,[1] the Court first concludes that the 2019 Instruction Memorandum does not violate the APA.  Therefore, the Court will **GRANT** summary judgment in favor of Defendants, as to Counts VI and VII, and **DISMISS WITH PREJUDICE** those two counts.  The Court, however, will not reach the merits of the remaining Counts I, II, III, IV, and V, at this time.  The Court has identified *sua sponte* a threshold problem with the justiciability of these five counts, which each pertain to the 2019 Gather Plan.  Because the parties did not address this question of justiciability in their briefs, the Court will **HOLD IN ABEYANCE** the parties' cross-motions for summary judgment on Counts I, II, III, IV, and V, and permit the parties an opportunity to respond to the Court's justiciability analysis presented herein.

---

[1] The Court's consideration has focused on the following briefing and material submitted by the parties:
- Compl., ECF No. 1;
- Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 23;
- Defs.' Mem. in Opp'n to Pl.'s Mot. & in Supp. of Cross-Mot. for Summ. J. ("Defs.' Mot."), ECF No. 24-1;
- Pl.'s Reply in Supp. of Pl.'s Mot. for Summ. J. & Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 26;
- Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 28; and,
- Joint App'x of Admin. Record ("TP"), ECF No. 29.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

# I.   BACKGROUND

## A.  Statutory Framework

In 1971, Congress enacted the Wild Free-Roaming Horses and Burros Act ("WHBA"), a law which identified wild horses and burros "as an integral part of the natural system of the public lands" and called for their protection "from capture, branding, harassment, or death."  16 U.S.C. § 1331.  "By 1978, however, Congress recognized that circumstances had changed," as wild horse and burro populations increased to the point of threatening natural habitats and resources.  *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (Ginsburg, Ruth B., J.). Accordingly, Congress amended the WHBA in 1978 to strike "a new balance . . . between protecting wild horses and competing interests in the resources of the public ranges."  *Id.*  "The main thrust of the 1978 amendments is to cut back on the protection the [WHBA] affords wild horses, and to reemphasize other uses of the natural resources wild horses consume."  *Id.*

As amended, the WHBA places "[a]ll wild free-roaming horses and burros . . . under the jurisdiction of the Secretary [of the Interior] for the purpose of management and protection."  16 U.S.C. § 1333(a).  The WHBA now requires the Secretary, acting through the Bureau of Land Management ("BLM"), "to manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands."  *Id.* But in doing so, BLM must conduct wild horse and burro "'management activities' 'at the minimal feasible level,' i.e., with as little disruption in the horses' [and burros'] lives as possible."  *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 139 (D.D.C. 2020) (quoting 16 U.S.C. § 1333(a)).

"To carry out its duty to manage the wild horses [and burros] on the public lands under its control," BLM administers "herd management areas" ("HMAs").  *Am. Wild Horse Campaign*, 442

F. Supp. 3d at 139.  In each HMA, BLM "determines an 'appropriate management level' ("AML") for the wild horse and burro populations," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 15 (D.C. Cir. 2006), in conjunction with the agency's broader land use plan for the area, *see* 43 C.F.R. §§ 4710.1, 4710.3-1.  BLM defines AML "as the median number of adult wild horses or burros determined through BLM's planning process to be consistent with the objective of achieving and maintaining a thriving ecological balance and multiple-use relationship in a particular area." *Fund for Animals, Inc.*, 460 F.3d at 16.

Once the agency sets an AML for a given HMA, the WHBA directs BLM to "determin[e] where wild horse . . . overpopulations exist." *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1317 (citing 16 U.S.C. § 1333(b)(1)).  Where BLM determines that "an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [BLM] shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2).  The WHBA requires the BLM to determine the "necessity" of a removal on the basis of "current" information.  *Id.*  But within this framework, "'the agency has wide discretion in how it addresses [an identified] overpopulation.'" *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 154 (quoting *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017)).  For example, BLM may initiate a gather of excess animals or employ other population control measures, such as fertility controls and sterilization.  *See Fund for Animals, Inc.*, 460 F.3d at 23; TP 1, 443.  BLM has developed an agency handbook and instruction memoranda, which provide guidance on how agency personnel should manage HMAs and carry out necessary animal removals.  *See* TP 12862–65; TP 12895–98; TP 12906.

In its effort to manage wild horse and burro populations, BLM must also comply with the requirements of the National Environmental Policy Act ("NEPA").  *See* 42 U.S.C. § 4331.  NEPA

requires federal agencies to "identify and assess in advance the likely environmental impact of [their] proposed actions, including its authorization or permitting of private actions." *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015) (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)).   NEPA "serves the twin purposes of ensuring that (1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms." *Id.* at 36–37 (citing *Pub. Citizen*, 541 U.S. at 768).   NEPA accomplishes these purposes by requiring agencies to take a "'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed." *Id.* at 37 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989)).

NEPA's "major action-forcing provision . . . is the requirement that all agencies of the Federal government prepare a detailed environmental analysis"—an Environmental Impact Statement ("EIS")—for "major Federal actions significantly affecting the quality of the human environment." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146 (D.C. Cir. 1985) (quoting 42 U.S.C. § 4332(C) (internal quotation marks omitted)).   An EIS must assess the action's anticipated "direct and indirect environmental effects," and consider "alternatives that might lessen any adverse environmental impact." *Sierra Club*, 803 F.3d at 37 (citing 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11)).   "If any significant environmental impacts might result from the proposed agency action, then an EIS must be prepared before the agency action is taken." *Grand Canyon Trust v. FAA*, 290 F. 3d 339, 340 (D.C. Cir. 2002) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)).

If, however, it is unclear whether an action will "significantly affect[ ] the quality of the human environment," the federal agency "may first prepare an Environmental Assessment ("EA")." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (internal citations and quotation marks omitted). An EA is "essentially, a preliminary consideration of potential environmental effects in a concise public document, designed to provide sufficient evidence and analysis for determining whether an EIS is needed." *Sierra Club*, 803 F.3d at 37 (internal citations and quotation marks omitted). The EA must discuss the "purpose and need for the proposed action, alternatives . . . and the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1501.5(c)(2). If the agency determines based on its EA that an EIS is not required, then the agency must issue a "finding of no significant impact ("FONSI"), which "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Pub. Citizen*, 541 U.S. at 757–58 (internal citations omitted). "Each form of NEPA analysis—EA/FONSI or EIS—requires public notice and comment, . . . and each is subject to judicial review." *Sierra Club*, 803 F.3d at 37–38 (citing *Pub. Citizen*, 541 U.S. at 763–64; *Grand Canyon Trust*, 290 F.3d at 340–42).

**B. Factual Background**

This case involves a challenge to two BLM actions carried out in the agency's ongoing effort to effectively manage wild horse and burro populations in accordance with the WHBA and NEPA. First, Plaintiff challenges BLM's Permanent Instruction Memorandum 2019-004 (the "2019 Instruction Memorandum"). *See* Pl.'s Mot. at 3–4. The agency issued the 2019 Instruction Memorandum on March 15, 2019 to provide BLM field officers with guidance on making wild horse and burro gather decisions. *See* TP 12862–65. The 2019 Instruction Memorandum supersedes a 2010 BLM instruction memorandum and "amends Chapter 7 of the 4700-1, Wild

Horse and Burro Management Handbook, which directed that [wild horse and burro] gather decisions be issued 31 to 76 days prior to initiation of gather activities." *Id.* at 12863. Instead, under the 2019 Instruction Memorandum, such "gather decisions should be issued at least 14 days prior to the proposed gather start date." *Id.* The 2019 Instruction Memorandum also states that "BLM should issue decisions authorizing gathers, removals, or population control actions through *a phased approach* or *over a multi-year period* when it determines that such an approach would help it achieve its management objectives." *Id.* at 12864 (emphasis added). According to the 2019 Instruction Memorandum, "[i]f the BLM issues a multi-year or open-ended decision to gather and manage [wild horses and burros] on the public lands, then no further decision is required to continue implementing the action unless the BLM determines that a change in conditions or objectives requires a new NEPA analysis and decision." *Id.*

Second, Plaintiff challenges a specific BLM gather decision made in November 2019, approving the phased removal of excess wild horses and burros from the Twin Peaks HMA over a ten-year period. *See* TP 1; Pl.'s Mot. at 9–11. The Twin Peaks HMA comprises nearly 790,000 acres of public and private lands situated on the California-Nevada border. *See* TP 14, 22, 37. Pursuant to a 2008 BLM resource management plan, the Twin Peaks HMA includes five home ranges for wild horses and burros, *see id.* at 1062, and operates under an established AML range of 448 to 758 wild horses and 72 to 116 burros, *id.* at 22. Since 1976, BLM has carried out approximately 25 gathers of wild horses and burros throughout the Twin Peaks HMA, in an effort to maintain a population size within the boundaries of the established AML ranges. *See id.* at 56. BLM last conducted a gather at the Twin Peaks HMA in 2010. *See id.* at 14.

In 2019, BLM conducted a direct animal count within and outside of the Twin Peaks HMA. *See id.*; 16 U.S.C. § 1333(b)(1). This survey revealed a population of approximately 2,338 wild

horses, 590 burros, and 39 mules at the Twin Peaks HMA.  *See* TP 56, 10652.  These population

totals were "530 percent over the low end of AML for wild horses and more than 720 percent over

the low end of AML for burros."  *Id.* at 1.  Moreover, BLM found that this significant excess of

wild horses and burros threatened the natural ecological balance of the Twin Peaks HMA and that

removal of the excess animals was necessary to "protect rangeland resources from further

degradation."  *Id.*; *see also* 16 U.S.C. § 1333(b)(2).  Accordingly, BLM proposed a ten-year plan

to gather and remove excess wild horses and burros from the Twin Peaks HMA and "implement a

range of fertility controls to maintain the population to within AML."  TP 660.  On May 31, 2019,

BLM submitted the proposed gather plan, along with a preliminary environmental assessment

report of the plan for public review and comment.  *See id.* at 656–839.  In response, the agency

received approximately 5,440 public comments, *see id.* at 5, including a comment from Plaintiff,

*see id.* at 210.

In November 2019, BLM issued the Final Twin Peaks Herd Management Area Wild Horse

and Burro Gather Plan Environmental Assessment, *see id.* at 18–207, which included an appendix

providing the agency's responses to the public comments received, *see id.* at 208–652.  BLM also

issued a FONSI, concluding that the proposed gather plan for the Twin Peaks HMA would not

"constitute a major federal action having a significant effect on the human environment" and,

therefore, an EIS for the plan under NEPA was not required.  *Id.* at 17.  BLM then issued its

decision record for the final Twin Peaks Herd Management Area Wild Horse and Burro Gather

Plan (the "2019 Gather Plan").  *See id.* at 1–13.

Under the final 2019 Gather Plan, BLM will "gather and remove as many excess wild

horses, burros, and mules as feasible from within and outside the Twin Peaks HMA for a period

of 10 years from the initial gather until low AML (448 horses and 72 burros) is reached for the

reproducing population." *Id.* at 1.  More specifically, the 2019 Gather Plan will include "[m]ultiple gathers over the course of 10 years," and "[a]fter each gather an aerial survey [will] be completed to count the remaining population, as funding allows." *Id.*  Additionally, the 2019 Gather Plan involves "the application of fertility control [treatment] to all mares that are released." *Id.*  The plan also states that "[a]fter low AML is reached . . . a portion of male horses would be sterilized, either by gelding (neutering) or vasectomy, and returned to the HMA." *Id.* at 2.  Finally, under the 2019 Gather Plan, the managed population of wild horses within the Twin Peaks HMA will not exceed a "60:40 male to female ratio." *Id.*

Importantly, as of the present date, BLM has not yet carried out or scheduled any round ups at the Twin Peaks HMA under the 2019 Gather Plan.  In the decision record for the 2019 Gather Plan, BLM committed to providing public notice of any round up carried out under the plan, *see* TP 8, but the parties' briefs do not indicate that such a round up has occurred.  Moreover, the Court has continuously reviewed publicly available sources, including the agency's official website, to identify whether BLM has scheduled any round ups under the 2019 Gather Plan.  As of the present date, the Court has not identified any notice of a scheduled round up at the Twin Peaks HMA under the 2019 Gather Plan challenged in this case.[2]

## C.  Procedural Background

Plaintiff filed its complaint before this Court on November 21, 2019, challenging both the 2019 Instruction Memorandum and the 2019 Gather Plan.  *See* Compl. ¶¶ 1–11.  Plaintiff's complaint asserts seven causes of action, collectively alleging violations of the APA, the WHBA, and NEPA.  *See id.* ¶¶ 134–161.  Because the WHBA and NEPA lack a specific statutory review

---

[2]   *See*   https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/california (last visited Feb. 28, 2021) (showing "No Gathers At This Time" scheduled for the Twin Peaks HMA).

provision, challenges under those statutes are also reviewed pursuant to the APA. *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).

In Counts I and II, Plaintiff alleges that the 2019 Gather Plan violates the WHBA because its fails to make a proper excess determination based on "current" information regarding the Twin Peaks HMA wild horse and burro population, *see* Compl. ¶¶ 134–36, and also because the gather plan fails to adequately protect wild horses and burros, as required by the WHBA, *see id.* ¶¶ 137–40. Next, in Counts III, IV, and V of the complaint, Plaintiff alleges that the 2019 Gather Plan runs afoul of NEPA because BLM failed to prepare an EIS for the plan, *see id.* ¶¶ 141–44, failed to consider reasonable alternatives to the 2019 Gather Plan, *see id.* ¶¶ 145–47, and failed to take a "hard look" at the gather plan's environmental impacts, *see id.* ¶¶ 148–51. Finally, in Counts VI and VII of the complaint, Plaintiff alleges that the 2019 Instruction Memorandum violates the APA because BLM issued it without public notice and comment, *see id.* ¶¶ 152–55, and also because the 2019 Instruction Memorandum constitutes an unexplained change in the agency's wild horse and burro removal policy, *see id.* ¶¶ 156–61.

Defendants answered Plaintiff's complaint on January 31, 2020, *see generally* Answer, ECF No. 9, and subsequently filed an amended answer on March 9, 2020, *see generally* Am. Answer, ECF No. 18. Then, on June 8, 2020, Plaintiff filed a motion for summary judgment, requesting that the Court vacate and remand both the 2019 Instruction Memorandum and the 2019 Gather Plan, and further enjoin the implementation of the 2019 Gather Plan at the Twin Peaks HMA. *See* Pl.'s Mot. at 45. In turn, Defendants filed a cross-motion for summary judgment requesting that the Court deny Plaintiff's summary judgment motion and uphold both the 2019 Instruction Memorandum and the 2019 Gather Plan. *See* Defs.' Mot. at 1. The parties have now fully briefed their cross-motions and have filed the administrative record before the Court.

Accordingly, Plaintiff's motion for summary judgment and Defendants' cross-motion for summary judgment are now ripe for the Court's review.

## II.   LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, "when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record. . . . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Southeast Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or, in certain circumstances, "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A)-(C), (E). "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). However, an agency is still required to "examine the relevant data and

articulate a satisfactory explanation for its action including a rational connection between the facts

found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks

omitted).  "Moreover, an agency cannot 'fail[ ] to consider an important aspect of the problem' or

'offer[ ] an explanation for its decision that runs counter to the evidence' before it."  *Dist. Hosp.*

*Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n*,

463 U.S. at 43).

### III.    DISCUSSION

#### A.  2019 Instruction Memorandum

The Court will first consider Plaintiff's request to set aside the 2019 Instruction

Memorandum issued by BLM in March 2019.  In its complaint, Plaintiff asserts two claims in

favor of invalidation.  First, Plaintiff alleges that the 2019 Instruction Memorandum is a "rule,"

that should have undergone the notice and comment requirements prescribed by the APA.  *See*

Compl. ¶¶ 152–55.  Second, Plaintiff alleges that the 2019 Instruction Memorandum constitutes

an unexplained shift in BLM policy.  *See id.* ¶¶ 156–61.  The Court will address each claim in turn.

#### 1.  The 2019 Instruction Memorandum Does Not Require Notice And Comment

In Count VI of the complaint, Plaintiff alleges that BLM "failed to comply with the notice

and comment rulemaking requirements of the APA" when issuing the 2019 Instruction

Memorandum.  Compl. ¶ 154.  The APA requires an agency "to publish notice of proposed

rulemaking in the Federal Register and to accept and consider public comments on its proposal"

when promulgating a "legislative rule."  *Mendoza v. Perez*, 754 F.3d 1002, 1020–21 (D.C. Cir.

2014).  "[L]egislative rules are those that grant rights, impose obligations, [ ] produce other

significant effects on private interests, or . . . effect a change in existing law or policy."  *Am. Tort*

*Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013)

(internal quotation marks and citations omitted).  "Stated differently, a rule is legislative, and therefore must undergo notice and comment, when it changes the law, or effectively amends a prior legislative rule."  *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 66 (D.D.C. 2020) (internal quotation marks and citations omitted).

"On the other hand, '[a]n agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy,'" which does not require notice and comment under the APA. *Vanda Pharm., Inc. v. Food & Drug Admin.*, 436 F. Supp. 3d 256, 269 (D.D.C. 2020) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014)). The line distinguishing legislative rules can be "blurry," *Vanda Pharm., Inc.*, 436 F. Supp. 3d at 269, but in making the distinction courts focus on "both the actual legal effects of the agency action and the agency's characterization of the action," *Ciox Health*, 435 F. Supp. 3d at 66.  And importantly, "to ascertain the nature of an agency action, courts should ground the analysis in the idiosyncratic regime of statutes and regulations that govern it."  *Calif. Communities Against Toxics v. E.P.A.*, 934 F.3d 627, 632 (D.C. Cir. 2019).

In this case, Plaintiff argues that the 2019 Instruction Memorandum is a "legislative rule," which requires notice and comment.  *See* Pl.'s Mot. at 17–22.  To support this position, Plaintiff first argues broadly that the 2019 Instruction Memorandum is non-tentative and contains "binding terms," representative of its substantive effect on both the agency and the public.  *Id.* at 18. Plaintiff then asserts that the 2019 Instruction Memorandum also affects specific legal rights and obligations.  Here, Plaintiff contends that the instruction memorandum curtails public access rights to BLM gather decisions by shortening the time between the issuance of a gather decision and the actual start date of the gather to a period of "at least 14 days."  *See id.* at 19; TP 12863.  Finally,

Plaintiff argues that the 2019 Instruction Memorandum's guidance regarding the possibility of "phased" gathers over a multi-year period "changes BLM's duty to issue site specific NEPA analysis for each removal or implementing decision."  Pl.'s Mot. at 3–5, 19.  For the reasons set forth below, the Court ultimately disagrees with Plaintiff and concludes that the 2019 Instruction Memorandum is a non-binding guidance document, not a legislative rule.

As an initial matter, "the hallmark of a binding rule is that '[i]t commands, it requires, it orders, it dictates.'"  *Vanda Pharm., Inc.*, 436 F. Supp. 3d at 270 (quoting *Nat'l Mining*, 758 F.3d at 252–53).  But here, the 2019 Instruction Memorandum expressly qualifies its scope by directing BLM field officials to adhere to its guidance "when feasible."  TP 12862.  The 2019 Instruction Memorandum also couches its more specific directives in advisory language.  For example, with regards to the pre-gather "protest period," the 2019 Instruction Memorandum states that "*[u]nless* an emergency situation or other relevant management considerations exist, gather decisions *should* be issued *at least* 14 days prior to the proposed gather start date."  *Id.* at 12863 (emphasis added).  And with regards to the agency's guidance on "phased" gathers, the 2019 Instruction Memorandum recommends that "BLM *should* issue decisions authorizing gathers, removals, or population control actions through a phased approach or over a multi-year period *when it determines that such an approach would help it achieve its management objectives*."  *Id.* at 12864 (emphasis added).  Similarly, the instruction memorandum states: "Because a one-time gather and removal operation can be inadequate to achieve or sustain the AML, the BLM *should consider* evaluating the effects of multiple gathers and other population control actions over a multi-year period."  *Id.* at 12863 (emphasis added).  Such permissive language about how BLM officials "should" carry out agency actions "when feasible" or what they "should consider," indicates that

the instruction memorandum is "meant to be precatory, not mandatory." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 718 (D.C. Cir. 2015).

Next, the Court also considers "the agency's own characterization" of the 2019 Instruction Memorandum. *Clarian Health West, LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017).  Here, the agency explains that the 2019 Instruction Memorandum "establishes policy and guidance for the issuance of WHB gather decisions and NEPA compliance."  TP 12862.  The agency also straightforwardly states that the 2019 Instruction Memorandum "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person."  *Id.* at 12865.  While this description alone is not wholly dispositive, it comports with the non-binding and precatory nature of the 2019 Instruction Memorandum discussed above.

Finally, the 2019 Instruction Memorandum does not alter any legal rights or obligations.  First, the Court is not persuaded by Plaintiff's argument that the 2019 Instruction Memorandum changes legal rights by "cut[ting] the time that parties can protest or seek review [of a gather decision] by more than half."  Pl.'s Mot. at 19.  It is true, that the 2019 Instruction Memorandum "amends" Chapter 7 of BLM's Wild Horse and Management Handbook, which provided that "gather/removal decisions shall be issued 31-76 days prior to the proposed gather start date."  TP 12953.  Now, under the 2019 Instruction Memorandum "gather decisions should be issued *at least 14 days prior* to the proposed gather start date."  *Id.* at 12863 (emphasis added).  The problem for Plaintiff, however, is that neither the WHBA, NEPA, nor any of their implementing regulations, require any protest period at all before the issuance of a BLM gather decision.  *See WildEarth Guardians v. Bernhardt*, No. 1:19-CV-00505-RB-SCY, 2020 WL 6799068, at *21 (D.N.M. Nov.

19, 2020).  To the contrary, the WHBA states that BLM must "*immediately* remove excess animals from the range," 16 U.S.C. § 1333(b)(2) (emphasis added), and BLM's regulations further explain that an authorized BLM official "may provide that decisions to remove wild horses or burros from public or private lands . . . shall be effective *upon issuance* or on a date established in the decision," 43 C.F.R. § 4770.3(c) (emphasis added).

Accordingly, the 2019 Instruction Memorandum's guidance that "gather decisions should be issued at least 14 days prior to the proposed gather start date," TP 12863, does not "change[] the law, or effectively amend[] a prior legislative rule," *Ciox Health, LLC*, 435 F. Supp. 3d at 66 (internal citation and quotation marks omitted).  Instead, it simply revises an internal administrative timeline for BLM officials included in the agency's handbook.  TP 12864.  And, as Defendants note, this BLM handbook itself did not undergo notice and comment and "does not have the independent force and effect of law sufficient to bind BLM."  *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1005 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020).  As such, the amended "protest period" in the 2019 Instruction Memorandum does not alter an existing legal right or obligation flowing from a statute or regulation.  *See WildEarth Guardians*, 2020 WL 6799068, at *21 (finding that "[n]o laws or regulations needed altering to shorten the timeline" set forth for "protest periods" in a BLM instruction memorandum).  Agencies like BLM are free to amend their own internal deadlines without undergoing notice and comment.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (explaining that the APA exempts "rules of agency organization, procedure, or practice" from the notice and comment requirements) (quoting 5 U.S.C. § 553(b)(A)).

Similarly, the Court is not persuaded by Plaintiff's argument that the 2019 Instruction Memorandum "changes BLM's duty to issue a site specific NEPA analysis for each removal or

implementing decision." Pl.'s Mot. at 19; *see also* Compl. ¶ 131. Plaintiff grounds this argument on the memorandum's statement that BLM officials "should issue decisions authorizing gathers, removals, or population control actions through a phased approach or over a multi-year period," and "[i]f the BLM issues a multi-year or open-ended decision to gather and manage WHBs on the public lands, then no further decision is required to continue implementing the action unless the BLM determines that a change in conditions or objectives requires a new NEPA analysis and decision." TP 12864. As discussed above, however, this "precatory" language regarding phased gathers does not bind BLM officials, but rather recommends a potential methodology for the removal of excess animals. *Ass'n of Flight Attendants*, 785 F.3d at 718. Moreover, the statement does not directly address, let alone alter, BLM's continuing obligations to complete the relevant NEPA documents before a gather decision and to submit them for public comment. *See Sierra Club*, 803 F.3d at 37–38. Indeed, the 2019 Instruction Memorandum directs BLM officials to "provide the public 30 days to review and comment on an Environmental Assessment (EA) for conducting WHB gathers on the public lands." TP 12862.

At bottom, Plaintiff is concerned with the implication in the 2019 Instruction Memorandum that BLM officials may carry out a multi-year gather plan including multiple round ups, on the basis of a single gather decision and NEPA analysis. *See* Pl.'s Mot. at 19. In Plaintiff's view, the agency does not have such authority. *See id.* at 24. But even if Plaintiff is correct in this matter, the dispute is best framed as a question of interpretation. And within this context, the 2019 Instruction Memorandum's statement regarding the use of phased gathers simply offers interpretive guidance on a potential gather approach the agency may use to "exercise its broad enforcement discretion . . . under some extant statute or rule," here the WHBA. *Vanda Pharm., Inc.*, 436 F. Supp. 3d at 269 (quoting *Nat'l Mining Ass'n*, 758 F.3d at 252). BLM's interpretive

guidance on the statutes it administers does not have binding legal effect.  *See Ass'n of Flight Attendants*, 785 F.3d at 713.

On balance, the aforementioned factors convince the Court that the 2019 Instruction Memorandum is a non-binding guidance document from BLM, not a "legislative rule."  As such, the 2019 Instruction Memorandum did not require notice and comment under the APA.  *See id.* at 716–17.  The Court will, therefore, **DENY** Plaintiff's motion for summary judgment on Count VI and **GRANT** Defendants' cross-motion for summary judgment on this Count.

### 2.  The 2019 Instruction Memorandum Does Not Constitute An Unexplained Change In BLM Policy

Next, in Count VII of the complaint, Plaintiff presents a separate basis for the invalidation of the 2019 Instruction Memorandum.  Here, Plaintiff argues that the 2019 Instruction Memorandum redirected BLM's wild horse and burro removal policy, but failed to provide an adequate explanation for the agency's change in course.  *See* Compl. ¶¶ 156–61; Pl.'s Mot. at 22–29.  Plaintiff bases this claim on the "central principle of administrative law" that "when an agency decides to depart from . . . past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it."  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).  For the reasons below, however, the Court finds that this claim also falls short.

#### a.  Phased Gathers

To support its APA claim in Count VII, Plaintiff first argues that the 2019 Instruction Memorandum implements a "new policy requiring issuance of multi-year, open-ended" phased gather decisions.  Pl.'s Mot. at 24; *see also id.* at 5.  According to Plaintiff, the requirement of a "phased gather" with multiple intervening round ups changes BLM's wild horse and burro removal policy in a number of interrelated ways.  First, phased gathers allegedly shift BLM's policy of

18

accepting public comments before each individual gather decision. *See id.* at 24.  Second, the phased gather approach also allegedly allows BLM to carry out gathers solely on the basis of AML, without making a separate determination on the necessity of removal in advance of each round up. *See* 16 U.S.C. § 1333(b)(2); Pl.'s Mot. at 24; TP 12952.  And third, Plaintiff asserts that under a phased gather approach BLM "will no longer prepare a NEPA document before each gather."  Pl.'s Mot. at 24.[3]

The Court is not persuaded by Plaintiff's arguments.  As an initial matter, Plaintiff's position relies on the assertion that the 2019 Instruction Memorandum "requires" multi-year phased gathers.  Pl.'s Mot. at 24.  But this assertion goes too far.  A plain reading of the 2019 Instruction Memorandum reveals that the document does not require, but merely recommends a multi-year phased gather plan when "such an approach would help [the agency] achieve its management objectives."  TP 12864.  As such, even if Plaintiff's arguments about the 2019 Instruction Memorandum were accurate, the document itself would not effectuate a binding policy change on any of the fronts Plaintiff raises.  *See disc. supra* at 14–18.

Moreover, Plaintiff's arguments misrepresent the true effects of the 2019 Instruction Memorandum.  Contrary to Plaintiff's assertions, the 2019 Instruction Memorandum does not permit BLM gather decisions to go forward without public comment, NEPA analysis, or solely on the basis of AML.  *See* Pl.s Mot. at 24.  Instead, the "phased gather" approach recommended by the 2019 Instruction Memorandum merely allows BLM officials to carry out *multiple round ups*

---

[3] Plaintiff also makes a passing argument that the 2019 Instruction Memorandum departs from a 1989 Herd Management Area Plan ("HMAP") for the Twin Peaks HMA. *See* Pl.'s Mot. at 23.  As Plaintiff explains, the 1989 HMAP calls for annual removal plans for the Twin Peaks HMA and states that "[n]o home range will be gathered in consecutive years."  TP 12736.  The Court is not persuaded, however, that the 2019 Instruction Memorandum, including its non-binding recommendation to consider phased gathers, departs from this 1989 HMAP.  Moreover, the record indicates that the provisions of the 1989 HMAP upon which Plaintiff relies have been superseded by a 2008 resource management plan.  *See* TP 442–43.

within the ambit of a *single gather decision*.  *See* TP 12864.  As Defendants explain, multiple

round ups may be a practical necessity where a single gather decision implicates hundreds or even

thousands of wild horses and burros, which cannot realistically be removed all at once.  *See* Defs.'

Mot. at 7.

Nonetheless, before issuing the original gather decision itself, BLM must still abide by the

requirements of the WHBA, *see* 16 U.S.C. § 1333(b)(2), and NEPA, *see* 42 U.S.C. § 4321, *et seq*.

In this case, for example, BLM issued a phased gather plan for the Twin Peaks HMA, but only did

so after preparing a NEPA analysis and submitting it for public comment.  *See* TP 5, 208–652.

Furthermore, the 2019 Gather Plan does not rest solely on a finding of excess wild horses and

burros, over the established AML ranges at the Twin Peaks HMA.  Instead, the gather decision

also includes a finding that removal of those excess animals was "necessary," 16 U.S.C. §

1333(b)(2), because of myriad factors, such as damage to riparian wetlands, threats to cultural

resources and private property, and the loss of vegetation, *see* TP 25, 42–45.  This example

illustrates that the 2019 Instruction Memorandum does not insulate BLM's gather decisions from

the WHBA and NEPA, but merely suggests that agency officials execute such gather decisions

over the course of multiple round ups where "such an approach would help [the agency] achieve

its management objectives."  TP 12864.

Furthermore, it is notable that a phased gather approach to wild horse and burro removal

is nothing new for BLM.  While BLM has previously employed *single* round up gather plans, *see,*

*e.g.*, *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 134–35 (D.D.C. 2017), the agency has

also implemented "phased" gather plans comprising *multiple* round ups over a multi-year period.

*See, e.g.*, TP 11639 (ten-year gather plan at Smoke Creek Complex); *Leigh v. Salazar*, No. 3:13-

cv-00006, 2014 WL 4700016, at *1 (D. Nev. Sept. 22, 2014) (approving a ten-year phased-gather

plan for Owyhee Complex using a single environmental assessment).  For this very reason, the Ninth Circuit just recently concluded that "BLM's use of a single gather plan and a single environmental assessment to cover a period of years and a series of individual gather operations is not a departure from the agency's past practice." *Friends of Animals v. Silvey*, 820 F. App'x 513, 516 (9th Cir. 2020).  The Court agrees with this persuasive assessment and concludes here that the 2019 Instruction Memorandum does not effectuate a binding change in BLM's wild horse and burro removal policy and practice.  Because the 2019 Instruction Memorandum "does not reflect a policy change, the Administrative Procedure Act does not require BLM to provide an explanation."  *Id.*; *see also Troy Corp. v. Browner*, 120 F.3d 277, 287 (D.C. Cir. 1997).

Finally, it also bears mention that the agency does, in fact, provide an explanation for its "phased gather" recommendation.  To start, the 2019 Instruction Memorandum states plainly that "a one-time gather and removal operation can be inadequate to achieve or sustain the AML."  TP 12863.  As such, the memorandum explains that a phased gather may increase the efficacy of a removal operation, as it "enhance[s] flexibility by allowing the BLM to adapt to unforeseen circumstances."  *Id.* at 12864.  In particular, the agency could adjust under a phased gather approach to "changes in national priorities, limited funding and holding space, reduced gather numbers, hard-to-catch or trap-shy animals, and emergency gather needs that impact gather schedules."  *Id.*  Ultimately, the 2019 Instruction Memorandum explains that a phased gather should be considered because "[t]his approach would provide the BLM sufficient time to achieve management objectives."  *Id.*  This agency explanation is facially reasonable.

In short, the "phased gather" recommendation in the 2019 Instruction Memorandum is neither a shift in BLM policy nor is it unexplained.  For these reasons, the Court cannot conclude that it supports the alleged APA violation presented in Plaintiff's Count VII.

### b.  14-Day Protest Period

Beyond its attack on "phased gathers," Plaintiff separately argues the 2019 Instruction Memorandum arbitrarily amends the pre-gather "protest period" previously endorsed by BLM. *See* Pl.'s Mot. at 24.  BLM's wild horse handbook and its prior 2010 instruction memorandum directed BLM officials to issue gather decisions 31-76 days before the proposed start date for the gather.  *See* TP 12897, 12953; Pl.'s Mot. at 24; Pl.'s Opp'n at 15.  Under the 2019 Instruction Memorandum, however, the agency now recommends that BLM officials issue gather decisions "at least 14 days prior to the proposed gather start date."  TP 12863.  On this point, Plaintiff has a stronger argument that this revised pre-gather protest period in the 2019 Instruction Memorandum constitutes a genuine "departure" in BLM's wild horse and burro removal practice.  *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 923.

Nonetheless, the 2019 Instruction Memorandum provides a clear explanation for this change in practice.  Specifically, the instruction memorandum explains that the original protest period of 31-76 days was designed "to allow opponents of the gather decision to pursue an administrative challenge before going to Federal Court."  TP 12863.  The agency found from experience, however, that such opponents would not pursue administrative remedies, but would instead proceed straight to a federal court and request injunctive relief on the eve of the planned gather.  *See id.*  Therefore, "the 31-76 day lead time did not achieve the intended purpose and furthermore, impeded management capabilities . . . by constraining the BLM's ability to respond to changing national gather priorities and unforeseen scheduling and funding limitations as well as compressing gather implementation windows."  *Id.* at 12864.  Accordingly, the 2019 Instruction Memorandum now recommends at least a 14-day protest period so as to "ensure[] the public has an opportunity to meaningfully participate in WHB management decisions," but also to "provide[]

the BLM with maximum flexibility for responding to on-range management needs." *Id.* On the present record, the Court finds that this explanation both acknowledges the agency's revised recommendation for a pre-gather protest period and offers a rational explanation for the new approach. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

In sum, and for the reasons set forth above, the Court concludes that the 2019 Instruction Memorandum does not represent an unexplained change in BLM policy and is not, therefore, "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" as Plaintiff alleges in Count VII. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923 (quoting 5 U.S.C. § 706(2)(A)). As such, the Court will **DENY** Plaintiff's motion for summary judgment on Count VII and **GRANT** Defendants' cross-motion for summary judgment on this Count.

## B. 2019 Gather Plan

Plaintiff's remaining claims in Counts I, II, III, IV, and V each relate to the 2019 Gather Plan—BLM's specific plan to remove excess wild horses and burros from the animal population at the Twin Peaks HMA. *See* TP 1–11. Collectively, these five counts challenge the 2019 Gather Plan under both the WHBA and NEPA. *See* Compl. ¶¶ 134–51. As mentioned above, however, BLM has not yet carried out or even scheduled any round ups at the Twin Peaks HMA under the 2019 Gather Plan. This fact raises a threshold question regarding the justiciability of Counts I, II, III, IV, and V, which neither party addressed in their respective summary judgment briefing. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). Accordingly, the Court will **HOLD IN ABEYANCE** the parties' cross-motions as to Counts I, II, III, IV, and V until after the parties have an opportunity to respond to the Court's justiciability concerns outlined herein.

### 1.   Justiciability and the Ripeness Doctrine

The jurisdiction of the federal courts is constrained by certain "doctrines of justiciability." *Trump v. New York*, 141 S. Ct. 530, 535 (2020).   These justiciability doctrines include the "ripeness" requirement, which courts may consider *sua sponte*.   *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 807–08.   This Court cannot reach the merits of a claim, including those in Plaintiff's Counts I through V, unless such claims are "ripe" for judicial review.   *See, e.g.*, *Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 48 (D.C. Cir. 1999); *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 134 (D.D.C. 2017).

The ripeness doctrine comprises two major components.   The first "is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is imminent or certainly impending."   *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 386 (D.C. Cir. 2012) (quotation omitted).   The second component of the ripeness doctrine, however, is prudential, because "[e]ven if a case is 'constitutionally ripe,' . . . there may also be 'prudential reasons for refusing to exercise jurisdiction.'"   *Id.* (quoting *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808).   Prudential ripeness turns on "'the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration.'"   *Garcia v. Acosta*, 393 F. Supp. 3d 93, 105 (D.D.C. 2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).   This prudential doctrine "'prevent[s] the courts . . . from entangling themselves in abstract disagreements over administrative policies," and also protects "agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"   *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807–08 (quoting *Abbott Labs.*, 387 U.S. at 148–

49).  As set forth below, Plaintiff's Counts I, II, III, IV, and V, each present significant problems under the doctrine of prudential ripeness.

## 2. Fitness

The first requirement of the prudential ripeness doctrine is that the legal issue in question be "fit" for judicial review.  "The fitness requirement promotes two important interests: first, 'the agency's interest in crystallizing its policy before that policy is subjected to judicial review,' and, second, 'the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'"  *Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. CV 18-2029 (RDM), 2021 WL 230139, at *8 (D.D.C. Jan. 22, 2021) (quoting *Wyo. Outdoor Council*, 165 F.3d at 49). "Under the fitness prong of this test, courts must consider (1) whether the claim raises a question that 'is purely legal, (2) whether consideration of the issue would benefit from a more concrete setting, and (3) whether the agency's action is sufficiently final.'"  *Garcia*, 393 F. Supp. 3d at 105 (quoting *Atl. States Legal Found. v. E.P.A.*, 325 F.3d 281, 284 (D.C. Cir. 2003)).  "[E]ven purely legal issues may be unfit for review."  *Atl. States Legal Found.*, 325 F.3d at 284.

### a. Counts I and II – WHBA Claims

First, the Court observes that Plaintiff's WHBA claims against the 2019 Gather Plan do not appear to be "fit" for judicial review on the present record.  In Count I, Plaintiff alleges that the 2019 Gather Plan and its potential for multiple round ups over a ten-year period violates the WHBA's requirement that BLM make gather decisions on the basis of "current" information.  *See* Compl. ¶ 135; 16 U.S.C. § 1333(b)(2).  In its summary judgment motion, Plaintiff relatedly argues that the 2019 Gather Plan violates the WHBA's "immediacy" requirement.  *See* Pl.'s Mot. at 14–15.  According to Plaintiff, "BLM does not have authority to issue open-ended decisions that allow it to remove wild horses and burros over the course of ten years," because these future round ups

will not have occurred "immediately" after the agency's initial excess determination.  *Id.*  In response, Defendants maintain that the WHBA "does not require excess determinations or AML to be recalculated before each gather under a multi-year decision.  Instead, it only requires BLM to rely on the currently available data" before issuing the *original* gather decision, not each subsequent round up thereunder.  Defs.' Mot. at 17.

The issues at play in Count II are related.  There, Plaintiff argues that the 2019 Gather Plan's proposal to "continually roundup and remove wild horse and burros, administer fertility controls, and sterilize a portion of the wild horse population" over a ten-year period "violates BLM's obligations to ensure management activities occur at the minimal feasible level."  Compl. ¶ 138.  Specifically, Plaintiff contends that "removing 80% of the [Twin Peaks wild horse and burro] population, repeatedly applying fertility controls, sterilizing a portion of the stallions, and removing wild horses and burros to maintain a low AML will create a population that is neither healthy nor self-sustainable."  Pl.'s Mot. at 17.  Plaintiff also faults the 2019 Gather Plan for permitting future round ups exclusively based on the current Twin Peaks AML, without making a separate decision in the future regarding the "necessity" of each specific round up.  *See id.* at 16.

While these issues in Counts I and II present "legal" questions, they are notably abstract given the current record before the Court.  *See Atl. States Legal Found.*, 325 F.3d at 284.  The 2019 Gather Plan for the Twin Peaks HMA indicates that "[m]ultiple gathers over 10 years would occur" "until low AML is reached for the reproducing population" of wild horses and burros.  TP 1.  But, as Plaintiff notes, the plan "does not define the total number of horses or burros that could be removed, nor does it specify when round ups and removals would occur."  Pl.'s Mot. at 10; *see also* TP 1–11.  In fact, neither party indicates whether BLM has even scheduled a round up under the 2019 Gather Plan at this time.  And with regards to fertility control and sterilization measures,

the 2019 Gather Plan is similarly opaque.  The decision record simply notes that "BLM would attempt to gather a sufficient number of wild horses to allow for the application of fertility control . . . to all mares that are released," TP 1, and that "a portion of male horses would be sterilized either by gelding (neutering) or vasectomy," *id.* at 2.  This language says nothing concrete about the number of mares and stallions that BLM will treat in practice or when such treatment might occur, if at all.  Finally, the 2019 Gather Plan creates further uncertainty by explaining that "BLM's funding and competing national priorities may affect the timing of gather operations and population control components of the proposed action."  *Id.*  Such administrative uncertainty weighs directly against the "fitness" of the WHBA claims in Counts I and II.

In *Friends of Animals v. United States Bureau of Land Management*, Judge Randolph Moss recently confronted a nearly identical problem regarding challenges Plaintiff made to four additional BLM ten-year gather plans.  In assessing the "fitness" of Plaintiff's WHBA claims in that case, Judge Moss first observed:

> [T]he challenged Decisions contemplate future, discrete agency actions—administering contraceptives to horses or removing them through future gathers—over the course of ten years. But when and under what circumstances those actions will occur remains to be determined. . . . The Decisions themselves set no timetables and, indeed, only include vague descriptions of the criteria for conducting future gathers.

*Friends of Animals*, 2021 WL 230139, at *4.  Given this uncertainty, Judge Moss reasoned that potential developments in BLM's yet unplanned gathers might alter the legal landscape confronting the Court.  For example, Judge Moss explained that BLM's potential violation of the WHBA "may depend at least in part on how much time passes before the gather occurs" and "whether any material conditions have changed" in the interim.  *Id.* at *9.  On this point, Judge Moss stated:

> FOA posits that the WH[B]A precludes the Bureau from conducting gathers based on stale information and analyses. Yet the strength of that argument may turn on

> the passage of time and intervening conditions. A gather conducted next month that merely completes (or attempts to complete) the Bureau's prior effort to achieve AML in the first instance poses different questions than a gather conducted years from now, after the Bureau has achieved AML and the herd size has re-grown to levels that strain the then-existing conditions on the range.

*Id.* In light of these yet unsettled factors, Judge Moss could not conclude that the disputed issues in Plaintiff's WHBA claims "[we]re fit for judicial determination." *Id.*

Plaintiff's WHBA claims in this case present a comparable challenge, and Judge Moss's persuasive reasoning in *Friends of Animals* applies with equal force. At this time, there is nothing concrete in the record to indicate whether BLM has even planned an initial round up at the Twin Peaks HMA under the 2019 Gather Plan, let alone what that round up might entail. And, as explained above, the 2019 Gather Plan does not specify when or how such round ups must proceed. As such, a number of questions still remain: When will BLM carry out round ups at the Twin Peaks HMA under the 2019 Gather Plan and how many will occur? How many animals will the agency remove in those round ups? How many mares will receive fertility treatment? How many stallions will the agency neuter? The answers to these questions bear directly on the legal inquiries under the WHBA presented in Plaintiff's Counts I and II, but to answer such questions at this juncture the Court must speculate about future BLM actions that have not yet been announced. In this context, the WHBA claims before the Court "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all," *Texas v. United States*, 523 U.S. 296, 300 (1998), and would, therefore, benefit "from further factual development of the issues presented," *Wyo. Outdoor Council*, 165 F.3d at 48–49 (quotation omitted). For these reasons, the Court concludes that Plaintiff's WHBA claims against the 2019 Gather Plan do not yet appear "fit" for judicial review.

### b.  Counts III, IV, and V – NEPA Claims

Next, the Court also finds that similar "fitness" problems impede this Court's review of Plaintiff's NEPA claims against the 2019 Gather Plan.  As discussed above, Plaintiff raises three NEPA claims in this case.  In Count III, Plaintiff argues that BLM should have, but did not, prepare an EIS before issuing the 2019 Gather Plan.  *See* Compl. ¶¶ 141–44.  Relatedly, Count IV alleges that BLM failed to adequately "consider a reasonable range of alternatives" before issuing the 2019 Gather Plan, *id.* ¶ 146, and Count V faults the agency for failing to take a "hard look" at the "cumulative, and site specific effects of the decision to continually roundup, permanently remove, castrate, and/or administer fertility control to wild horses and burros from the Twin Peaks HMA for a ten year period," *id.* ¶ 150.

Plaintiff's summary judgment briefing confirms that each of these NEPA claims turns on the possibility of future BLM round ups and the conditions under which they might transpire.  For example, Plaintiff argues that "BLM's decision to return castrated horses to the range involves unique and unknown risks that are also highly controversial and therefore warrant preparation of an EIS."  Pl.'s Mot. at 31.  Similarly, Plaintiff argues that the "fertility control applications" referenced in the 2019 Gather Plan will "have significant impacts on both a changing landscape and a protected species."  *Id.* at 30.  Plaintiff further complains that BLM failed to "consider the possibility that less aggressive management of wild horses, and more tolerance of natural processes" could achieve the desired result, instead of animal removal.  *Id.* at 44.  Finally, Plaintiff asserts more generally that BLM violated NEPA when it "fail[ed] to take a hard look at the unique risks of a combination of ten years of incessant roundups, unlimited fertility control applications, and dangerous sterilizations."  *Id.* at 38.

Like Plaintiff's WHBA claims, these NEPA arguments present "abstract disagreements over administrative policies," *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808, contingent upon "future events that may not occur as anticipated, or indeed may not occur at all," *Texas*, 523 U.S. at 296. Plaintiff's NEPA complaints emphasize the "*potentially* significant consequences" the agency ignored when issuing the 2019 Gather Plan without an EIS, Pl.'s Opp'n at 18 (emphasis added), and point to the cumulative impact of "incessant" round ups and "unlimited" fertility controls applied over a ten year period at the Twin Peaks HMA, Pl.'s Mot. at 38.  But the 2019 Gather Plan presently before the Court does not commit to any specific number of round ups, nor does it require the agency to carry out any specific level of fertility control or sterilization within the Twin Peaks HMA.  *See* TP 1–11; disc. *supra* at 24–25.  To date, the record does not even indicate that BLM has planned any formal round up under the 2019 Gather Plan for the Court to consider. Consequently, an assessment of the 2019 Gather Plan's procedural adequacy under NEPA would implicate hypothetical conjecture about the round ups that might occur at the Twin Peaks HMA in the future and the way in which BLM will carry them out.

Moreover, BLM has not "foreclose[d] the possibility that further NEPA analysis will be needed to accommodate future management actions for the Twin Peaks HMA."  Defs.' Mot. at 18. To that end, the 2019 Instruction Memorandum explains that even during "multi-year" gather plans, like the 2019 Gather Plan, the agency may still "determine[] that a change in conditions or objectives requires a new NEPA analysis and decision."  TP 12864.  And with regards to the 2019 Gather Plan at Twin Peaks, BLM notes that "[o]ngoing monitoring of forage condition and utilization, water availability, aerial population surveys, and animal health would continue."  TP 73.  Such monitoring may very well lead to new NEPA analysis and documentation from the agency, negating or at least altering Plaintiff's NEPA claims now before the Court.  *See Friends*

*of Animals*, 2021 WL 230139, at \*9 ("The length of time that passes between an agency's . . . NEPA analysis and the contemplated action may bear on the adequacy of that analysis, particularly if conditions have changed in material respects. . . . [S]uch a change might well prompt the Bureau to conduct the type of NEPA analysis that FOA claims is missing here.").

For these reasons, the Court concludes Plaintiff's NEPA claims in Counts III, IV, and V would greatly benefit "from further factual development of the issues presented." *Wyo. Outdoor Council*, 165 F.3d at 48–49 (quotation omitted).  As such, these claims do not yet appear fit for judicial review, at least given the present record before the Court.

### 3.  Hardship

The second factor of prudential ripeness considers "'the hardship to the parties of withholding court consideration.'"  *Garcia*, 393 F. Supp. 3d at 105 (quoting *Abbott Labs.*, 387 U.S. at 149).  "Under the hardship prong, courts must ask whether the challenged administrative action is likely to have a 'direct and immediate effect' on the 'primary conduct' of the plaintiff."  *Id.* (quoting *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967)).  The focus of this hardship inquiry, however, "is not whether [the parties] have suffered any direct hardship, but rather whether *postponing* judicial review would impose an undue burden on them or would benefit the court."  *Harris v. F.A.A.*, 353 F.3d 1006, 1012 (D.C. Cir. 2004) (emphasis in the original and quotation omitted).

In this case, the potential source of hardship is that BLM might proceed with a round up at the Twin Peaks HMA under the 2019 Gather Plan without notifying the public, including Plaintiff.  "[U]nder those circumstances, [Plaintiff's] ability to bring a challenge could be mooted before it even learns of the suspect agency action."  *Friends of Animals*, 2021 WL 230139, at \*11.  This concern, however, is neutralized by BLM's position on the record.  The agency has committed "to

the transparent maintenance of the Twin Peaks HMA over the ten-year decision period," Defs.'
Reply at 6, and the 2019 Gather Plan specifically states that "BLM will provide a schedule to allow
members of the public to observe the Twin Peaks gather operations," TP 8.  "Prior to any gather
activity," BLM will also "issue press releases" to notify the public.  *Id.*  And, under the 2019
Instruction Memorandum, BLM officials should provide such notice "*at least* 14 days prior to the
planned gather start date."  TP 12863 (emphasis added).

        BLM's commitment to providing public notice in advance of any future round ups at the
Twin Peaks HMA convinces the Court that Plaintiff will have an adequate opportunity to challenge
such a round up in advance of its consummation.  Plaintiff has already demonstrated its ability to
quickly challenge round up decisions announced by BLM in the past.  *See Friends of Animals v.*
*U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 59 (D.D.C. 2017).  "The Court is accordingly
unpersuaded, at least on the existing record, that any burden to the parties that might result from
postponing review outweighs the institutional interest in postponing review."  *Friends of Animals*,
2021 WL 230139, at *11.

****

        In sum, the Court has identified serious "ripeness" questions impeding this Court's review
of the WHBA and NEPA claims in Counts I, II, III, IV, and V.  This threshold justiciability barrier
threatens to "entangle" the Court in the parties' "abstract disagreements" about the 2019 Gather
Plan before BLM's "administrative decision has been formalized and its effects felt in a concrete
way."  *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807.  Such judicial intervention would be particularly
inadvisable given that "BLM's findings of wild horse overpopulations should not be overturned
quickly on the ground that they are predicated on insufficient information."  *Am. Horse Prot. Ass'n,*
*Inc. v. Watt*, 694 F.2d 1310, 1318 (D.C. Cir. 1982).

Nonetheless, the parties did not address the question of justiciability in their summary judgment briefing.  The Court will, therefore, **HOLD IN ABEYANCE** the parties' cross-motions as to Counts I, II, III, IV, and V, until after the parties have an opportunity to respond to the Court's justiciability concerns outlined above.  The Court will provide a schedule for this supplemental briefing in the Order accompanying this Memorandum Opinion.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court will **GRANT** summary judgment in favor of Defendants, as to Counts VI and VII, and **DISMISS WITH PREJUDICE** those two counts.  The Court, however, will **HOLD IN ABEYANCE** the parties' cross-motions for summary judgment on Counts I, II, III, IV, and V, and permit the parties an opportunity to provide supplemental briefing on the issues of justiciability addressed in this Memorandum Opinion.  An appropriate Order accompanies this Memorandum Opinion.

**Dated**: February 28, 2021

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge