**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF ANIMALS,<br><br>          Plaintiff,<br><br>     v.<br><br>NADA WOLFF CULVER, in her official<br>capacity as the Deputy Director of the United<br>States Bureau of Land Management for Policy<br>and Programs, *et al.*<br><br>          Defendants. | Civil Action No. 19-3506 (CKK) |

**MEMORANDUM OPINION**
(June 28, 2022)

For the second time, this environmental matter is before the Court on cross-motions for summary judgment.  This case concerns the United States Bureau of Land Management's ("BLM") 2019 decision to remove a number of wild horses and burros from the Twin Peaks Herd Management Area, a range located along the California-Nevada Border ("Decision").  Plaintiff, an animal-rights organization, argues that BLM's decision:  (1) exceeds its discretion under its applicable enabling act, the Wild Free-Roaming Horses and Burros Act, and (2) unlawfully failed to account for and consider a number of environmental effects arising from the Decision.  Because the Court agrees that the Decision exceeds statutory authority insofar as it permits removal of excess horses and burros up to ten years from its promulgation, the Court shall remand the Decision to BLM for further consideration in light of this Memorandum Opinion.  However, as the Decision otherwise complies with BLM's relevant statutory obligations, the Court shall not vacate the Decision pending remand.

In sum, and upon consideration of the briefing, the relevant authorities, and the record as a whole,[1] the Court will **GRANT IN PART AND DENY IN PART** Plaintiff's [23] Motion for Summary Judgment, **GRANT IN PART AND DENY IN PART** Defendants' [24] Cross-Motion for Summary Judgment, and **REMAND** this matter to BLM for further consideration in light of this Memorandum Opinion.

## I.   BACKGROUND

### A.  Statutory Framework

In 1971, Congress enacted the Wild Free-Roaming Horses and Burros Act ("WHBA"), a law which identified wild horses and burros "as an integral part of the natural system of the public lands" and called for their protection "from capture, branding, harassment, or death."  16 U.S.C. § 1331.  "By 1978, however, Congress recognized that circumstances had changed," as wild horse and burro populations increased to the point of threatening natural habitats and resources.  *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (Ginsburg, Ruth B., J.).  Accordingly, Congress amended the WHBA in 1978 to strike "a new balance . . . between protecting wild horses and competing interests in the resources of the public ranges."  *Id.*  "The

---

[1] The Court's consideration has focused on the following briefing and material submitted by the parties:

- Compl., ECF No. 1;
- Pl.'s Mot. for Summ. J. ("Pls.' Mot."), ECF No. 23;
- Defs.' Mem. in Opp'n to Pl.'s Mot. & in Supp. of Cross-Mot. for Summ. J. ("Defs.' Mot."), ECF No. 24-1;
- Pl.'s Reply in Supp. of Pl.'s Mot. for Summ. J. & Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 26;
- Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 28; and
- Joint App'x of Admin. Record ("TP"), ECF No. 29;
- Plaintiff's Supplemental Memorandum, ECF No. 35; and
- Defendants' Supplemental Memorandum, ECF No. 36.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

main thrust of the 1978 amendments is to cut back on the protection the [WHBA] affords wild horses, and to reemphasize other uses of the natural resources wild horses consume." *Id.*

As amended, the WHBA places "[a]ll wild free-roaming horses and burros . . . under the jurisdiction of the Secretary [of the Interior] for the purpose of management and protection." 16 U.S.C. § 1333(a). The WHBA now requires the Secretary, acting through BLM, "to manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* But in doing so, BLM must conduct wild horse and burro "'management activities' 'at the minimal feasible level,' i.e., with as little disruption in the horses' [and burros'] lives as possible." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 139 (D.D.C. 2020) (quoting 16 U.S.C. § 1333(a)).

"To carry out its duty to manage the wild horses [and burros] on the public lands under its control," BLM administers "herd management areas" ("HMAs"). *Id.* In each HMA, BLM "determines an 'appropriate management level' ('AML') for the wild horse and burro populations," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 16 (D.C. Cir. 2006), in conjunction with the agency's broader land use plan for the area, *see* 43 C.F.R. §§ 4710.1, 4710.3-1. BLM defines AML "as the median number of adult wild horses or burros determined through BLM's planning process to be consistent with the objective of achieving and maintaining a thriving ecological balance and multiple-use relationship in a particular herd area." *Fund for Animals, Inc.*, 460 F.3d at 16.

Once the agency sets an AML for a given HMA, the WHBA directs BLM to "determin[e] where wild horse . . . overpopulations exist." *Am. Horse Prot. Ass'n, Inc.*, 694 F.2d at 1317 (citing 16 U.S.C. § 1333(b)(1)). Where BLM determines that "an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [BLM] shall immediately

remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2).  The WHBA requires the BLM to determine the "necess[ity]" of a removal on the basis of "current[]" information.  *Id.*  But within this framework, "'the agency has wide discretion in how it addresses [an identified] overpopulation.'"  *Am. Wild Horse Campaign*, 442 F. Supp. 3d at 154 (quoting *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017)).  For example, BLM may initiate a gather of excess animals or employ other population control measures, such as fertility controls and sterilization.  *See Fund for Animals, Inc.*, 460 F.3d at 23; TP 1, 443.  BLM has developed an agency handbook and instruction memoranda, which provide guidance on how agency personnel should manage HMAs and carry out necessary animal removals.  *See* TP 12862–65; TP 12895–98; TP 12906.

In its effort to manage wild horse and burro populations, BLM must also comply with the requirements of the National Environmental Policy Act ("NEPA").  *See* 42 U.S.C. § 4331.  NEPA requires federal agencies to "identify and assess in advance the likely environmental impact of [their] proposed actions, including its authorization or permitting of private actions."  *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015) (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)).  NEPA "serves the twin purposes of ensuring that (1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms."  *Id.* at 36–37 (citing *Pub. Citizen*, 541 U.S. at 768.  NEPA accomplishes these purposes by requiring agencies to take a "'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed."  *Id.* at 37 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989)).

NEPA's "major action-forcing provision . . . is the requirement that all agencies of the Federal government prepare a detailed environmental analysis"—an Environmental Impact Statement ("EIS")—for "major Federal actions significantly affecting the quality of the human environment." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146 (D.C. Cir. 1985) (quoting 42 U.S.C. § 4332(C) (internal quotation marks omitted)). An EIS must assess the action's anticipated "direct and indirect environmental effects," and consider "alternatives that might lessen any adverse environmental impact." *Sierra Club*, 803 F.3d at 37 (citing 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11)). "If any significant environmental impacts might result from the proposed agency action, then an EIS must be prepared before the agency action is taken." *Grand Canyon Trust v. FAA*, 290 F. 3d 339, 340 (D.C. Cir. 2002) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)).

If, however, it is unclear whether an action will "significantly affect[ ] the quality of the human environment," the federal agency "may first prepare an Environmental Assessment ("EA")." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (internal citations and quotation marks omitted). An EA is "essentially, a preliminary consideration of potential environmental effects in a concise public document, designed to provide sufficient evidence and analysis for determining whether an EIS is needed." *Sierra Club*, 803 F.3d at 37 (internal citations and quotation marks omitted). The EA must discuss the "purpose and need for the proposed action, alternatives . . . and the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1501.5(c)(2). If the agency determines based on its EA that an EIS is not required, the agency must issue a "finding of no significant impact ("FONSI"), which "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Pub. Citizen*, 541 U.S. at 757–58 (internal citations omitted). "Each form

of NEPA analysis—EA/FONSI or EIS—requires public notice and comment, . . . and each is subject to judicial review." *Sierra Club*, 803 F.3d at 37–38 (citing *Pub. Citizen*, 541 U.S. at 763–64; *Grand Canyon Trust*, 290 F.3d at 340–42).

## B.  Factual Background

Initially, this case involved a challenge to two BLM actions: BLM's Permanent Instruction Memorandum 2019-004 (the "2019 Instruction Memorandum") and the Decision.  *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 49 (D.D.C. 2021).  Concluding that the 2019 Instruction Memorandum was not a "final agency action" within the meaning of the APA, the Court has since granted summary judgment in favor of Defendants on Plaintiff's APA claims, Counts VI and VII of the operative complaint.  *Id.* at 47.  Plaintiff's WHBA and NEPA claims remain as to the Decision.

The Decision, made in November 2019, approves the "phased" removal of excess wild horse and burros from the Twin Peaks HMA over a ten-year period.  *See* TP 1; Pl.'s Mot. at 9–11. The Twin Peaks HMA comprises nearly 790,000 acres of public and private lands situated on the California and Nevada border.  *See* TP 14, 22, 37. Pursuant to a 2008 BLM resource management plan, the Twin Peaks HMA includes five home ranges for wild horses and burros, *see id.* at 1062, and operates under an established AML range of 448 to 758 wild horses and 72 to 116 burros, *id.* at 22.  Since 1976, BLM has carried out approximately 25 gathers of wild horse and burros throughout the Twin Peaks HMA, in an effort to maintain a population size within the boundaries of the established AML ranges.  *See id.* at 56.  BLM last conducted a gather in the Twin Peaks HMA in 2010.  *See id.* at 14.

In 2019, BLM conducted a direct animal count within and outside of the Twin Peaks HMA. *See id.*; 16 U.S.C. § 1333(b)(1).  This survey revealed a population of 2,338 wild horses, 520

burros, and 39 mules, which was well above the established AML ranges for those animals within the Twin Peaks HMA. *See* TP 56; 10652. Moreover, BLM found that this excess of wild horses and burros threatened the natural ecological balance of the HMA and that removal of the excess animals was necessary to "protect rangeland resources from further degradation." TP 1; *see also* 16 U.S.C. § 1333(b)(2). Accordingly, BLM proposed a ten-year plan to gather and remove excess wild horses and burros from the Twin Peaks HMA and "implement a range of fertility controls to maintain the population to within AML." TP 660. On May 31, 2019, BLM submitted the proposed gather plan, along with a preliminary environmental assessment report of the plan for public review and comment. *See id.* at 656–839. In response, the agency received approximately 5,440 public comments, *see id.* at 5, including a comment from Plaintiff, *see id.* at 210.

In November 2019, BLM issued the Final Twin Peaks Herd Management Area Wild Horse and Burro Gather Plan Environmental Assessment, *see id.* at 18–207, which included an appendix providing the agency's responses to the public comments received, *see id.* at 208–652. BLM also issued a FONSI, concluding that the proposed gather plan for the Twin Peaks HMA would not "constitute a major federal action having a significant effect on the human environment," and, therefore, an EIS for the plan under NEPA was not required. *Id.* at 17. BLM then issued its decision record for the final Twin Peaks Herd Management Area Wild Horse and Burro Gather Plan (the Decision). *See id.* at 1–13.

Under the final Decision, BLM will "gather and remove as many excess wild horses, burros, and mules as feasible from within and outside the Twin Peaks HMA for a period of 10 years from the initial gather until low AML [448 horses and 72 burros] is reached for the reproducing population." *Id.* at 1. More specifically, the Decision will include "[m]ultiple gathers over the course of 10 years," and "[a]fter each gather an aerial survey [will] be completed to count

the remaining population, as funding allows." *Id.*  Additionally, the Decision involves "the application of fertility control [treatment] to all mares that are released." *Id.*  The plan also states that "[a]fter low AML is reached . . . a portion of male horses would be sterilized, either by gelding (neutering) or vasectomy, and returned to the HMA." *Id.* at 2.  Finally, under the Decision, the managed population of wild horses within the Twin Peaks HMA will not exceed a "60:40 male to female ratio." *Id.*  Plaintiff alleges, and Defendants do not contest, that the first "roundup" pursuant to the Decision will begin on July 23, 2022.  Notice, ECF No. 39.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  However, "when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Accordingly, "the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record. . . . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Southeast Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege or immunity;" "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right;" or, in certain circumstances, "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A)-(C), (E).  "This is a 'narrow' standard of review as courts defer to the agency's expertise."  *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  However, an agency is still required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted).  "Moreover, an agency cannot 'fail[ ] to consider an important aspect of the problem' or 'offer[ ] an explanation for its decision that runs counter to the evidence' before it."  *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

## III.   DISCUSSION

Before turning to the merits of Plaintiff's remaining claims, a word on justiciability is necessary.  In its last Memorandum Opinion, the Court was concerned that Plaintiff's remaining claims were not constitutionally and/or prudentially ripe because Plaintiff had not shown that any roundup under the Decision was imminent.  *Friends*, 523 F. Supp. 3d at 62.  Because the first roundup under the Decision is, in fact, now imminent, ECF No. 39, the Court concludes that Plaintiff's claims are ripe for resolution.

Plaintiff's WHBA claims encompass three arguments.  First, Plaintiff argues that the Decision erroneously concludes, based on insufficient or incorrect scientific findings, that the planned actions do not protect the ecological balance in Twin Peaks "at the minimal feasible level" of human intervention.  Pl.'s Mot. at 17.  Second, Plaintiff insists that "BLM does not have authority to issue open-ended decisions that allow it to remove wild horses and burros over the

course of ten years," because these future roundups will not have occurred "immediately" after the agency's initial excess determination. *Id.* at 14-15. Finally, Plaintiff maintains that the Decision and its potential for multiple round ups over a ten-year period violates the WHBA's requirement that BLM make gather decisions on the basis of "current" information. *See* Compl. ¶ 135. As to the first argument, the Court concludes that BLM's scientific findings are not arbitrary, capricious, or otherwise unsupported by the record. As to the second argument, however, the Court agrees that BLM's ten-year deadline exceeds its discretion, per statutory command, to "immediately remove excess animals from the range so as to achieve appropriate management levels." As such, the Court does not reach Plaintiff's third argument. Finally, the Court sees no NEPA violation on the record before it.

## A. WHBA Claims

"'Because neither NEPA nor the [WHBA] contain[s] an internal standard of review, the [APA] governs this [C]ourt's review of [] BLM's actions.'" *Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 55 (D.D.C. 2021) (quoting *In Def. of Animals*, 751 F.3d at 1061). A court may set aside an agency action under section 706 only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Additionally, an agency action "'in excess of statutory jurisdiction, authority, or limitations,' likewise, must be set aside." *Friends of Animals*, 548 F. Supp. 3d at 55 (quoting 5 U.S.C. § 706(2)(C)). "The scope of review under the 'arbitrary and capricious standard is narrow[,] and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. "That said, the Court must satisfy itself that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Amgen Inc. v. Azar*, 290 F. Supp. 3d 65, 70 (D.D.C. 2018) (quoting *State Farm*, 463 U.S. at 43).

As addressed above, although the WHBA was initially and almost exclusively aimed at protecting wild horse and burro populations, it is now part and parcel of BLM's broader obligation to "manage the public lands under principles of multiple use and sustained yield." *Fund for Animal*, 460 F.3d at 15 (quoting 43 U.S.C. § 1732(a)).  Although the statute "direct[s] [BLM] to protect and manage wild free-roaming horses and burros as components of public lands," 16 U.S.C. § 1333(a), the main thrust of the statute as it currently stands is less to protect "wild horses, and [more] to reemphasize other uses of the natural resources wild horses consume," *Am. Horse Protection*, , 694 F.2d 1310 at 1316 (discussing the effects of WHBA's 1978 amendments).  In addition to considering the health and welfare of wild horses and burros, the WHBA directs BLM "achieve and maintain a thriving natural ecological balance on the public lands."  16 U.S.C. § 1333(a).

To do so, BLM must maintain "current inventor[ies] of wild free-roaming horses and burros on given areas of the public lands." *Id.* § 1333(B)(1).  BLM does so by first defining "given areas of the public lands" as "herd management areas," 43 C.F.R. § 4710.3-1, and then, after scientific review, sets "appropriate management levels" ("AML"), 16 U.S.C. § 1333(b)(1).  When BLM determines that a wild horse or burro population exceeds that AML, BLM must then determine whether action is necessary.  If it (1) determines that the current population of wild horses and burros is above the applicable AML and (2) further determines that action is necessary to reduce that population, BLM must "immediately" remove the excess population "by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." *Id.*  In this way, the statute creates a triggering event—once BLM makes those two determinations, federal law requires BLM to "immediately" remove the excess.  *See id.*; *see also In Def. of Animals v. U.S. Dept' of Interior*, 751 F.3d 1054, 1063-64 (9th Cir. 2014).

First, Plaintiff argues that the Decision so harms wild horses' genetic diversity in Twin Peaks to the point that, if implemented, BLM would not "protect" wild horses as directed by the WHBA.  Pl.'s Mot. at 17.  Plaintiff devotes remarkably little briefing to this argument—less than a page—and cites to a total of five pages in the administrative record for that scientific proposition. *Id.*  First, Plaintiff notes that one of the scientific reports on which BLM relied in its Decision concluded that then-"current [genetic] variability levels are high enough that no action is needed at this point [to spur genetic diversity] but the heterozygosity levels are near concern values."  TP 165.  In the preceding paragraph, the report concluded that "[g]enetic variability of this herd is high both for the total herd and the individual subpopulations sampled."  *Id*.  Relying in part on these findings, the Decision concluded that "[t]he genetic diversity of the herds in Twin peaks HMA has remained stable."  *Id.*  Indeed, in coming to that conclusion, the Decision specifically considered and addressed concerns shared by both Plaintiff and other organizations in the notice-and-comment period.  *See, e.g.*, TP 229-30.  More broadly, the record shows substantial, scientific consideration given to the state of riparian resources, cultural resources, upland vegetation and soil, wildlife, and horse health generally.  *See* TP 4-6 (summarizing findings).  On this record, the Court cannot conclude that BLM's genetic variability finding, as it relates to the WHBA, was either "so implausible that it could not be ascribed to a difference in view or the product of agency expertise" or a "fail[ure] to consider an important aspect of the problem."  *See Friends of the Earth v. Haaland*, --- F. Supp. 3d ---, 2022 WL 254526, at *5 (D.D.C. Jan. 27, 2022) (quoting *Motor Vehicle Ass'n*, 463 U.S. at 43).

Plaintiff's argument against the ten-year "phased" approach of the Decision fares far better.  As a threshold matter, the parties contest the meaning of the term "immediately" in the WHBA.  As with all questions of statutory interpretation, the Court begins with the text.  *Citizens*

*for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1018 (D.C. Cir. 2018).  The Court must first

apply "the ordinary tools of statutory construction" to determine "whether Congress has directly

spoken to the precise question at issue."  *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842 & n.9

(1984).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress."  *City of

Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. at 842-43).  The

Court "will not resort to legislative history to cloud a statutory text that is clear."  *Citizens for

Resp. & Ethics in Wash.*, 904 F.3d at 1018.

BLM, which does not invoke *Chevron* deference for this question, insists that the term

"'immediately remove' excess wild horses must account for the practical realities of the removal

process.'"  Defs.' Repl. at 4 (quoting *W. Rangeland*, 265 F. Supp. 3d at 1287).  Doing so, BLM

proposes, would lead the Court to conclude that waiting ten years to remove excess horses is

"immediately" removing excess horses.  Plaintiff, on the other hand, argues that "immediately"

means what it says.  Pl.'s Mot. at 13.  "Immediately" means "[o]curring without delay; instant."

"Immediate," *Black's Law Dictionary* (9th ed. 2009).  As the D.C. Circuit has explained, the use

of this term indicates Congress's desire that "excess horses . . . be removed *expeditiously*" and that

"*prompt* action was needed to redress . . . imbalance[d]" populations and natural resources.  *Am.

Horse Protection*, 694 F.2d at 1316-17 (emphasis altered); *see also Blake v. Babbitt*, 837 F. Supp.

458, 459 (D.D.C. 1993) (finding that the WHBA requires truly immediate action upon an excess

finding because of Congress' determination in the WHBA that "the endangered and rapidly

deteriorating range cannot wait").

There is no indication in the statute that "immediately" does not require BLM to remove

excess horses or burros "without delay," and, on the Court's review, there is no statutory definition

otherwise altering the plain meaning of "immediately."  To the contrary, as the Ninth Circuit has concluded, as a matter of statutory interpretation, the WHBA permits BLM to take measures not delineated by statute because BLM must also comply with the WHBA's command to "remove 'excess' horses immediately to maintain the established AMLs."  *In Def. of Animals*, 751 F.3d at 1066 n.20.  Even if there were some ambiguity to the term—there is not—BLM points to no legislative history that would suggest "immediately" means anything other than what it says. Although a statutory deadline may be impracticable, or even impossible, an agency's failure to comply with a statutory deadline is necessarily unlawful.  *See, e.g.*, *South Carolina v. United States*, 907 F.3d 742, 755 (4th Cir. 2018); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 192 (D.C. Cir. 2016).  Moreover, the Court is, as a general matter, "required to enforce statutory deadlines" in enabling acts.  Hickman & Pierce, *Administrative Law Treatise* § 14.3 (6th ed. 2019) (collecting cases).

To be sure, courts of this jurisdiction regularly excuse compliance with statutory deadlines where equity commands.  For example, in *Open America v. Water Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976), the D.C. Circuit refused to enforce the Freedom of Information Act's 30-day deadline for the processing of FOIA requests where doing so was near impossible for "all agencies."  *See id.* at 614.  Nevertheless, "[h]owever many priorities the agency may have, and however modest its personnel and budgetary resources may be, there is a limit to how long it may use these justifications to excuse inaction in the face of [a statutory deadline]."  *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 554 (D.C. Cir. 1999).  *But see Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) (enforcing 12-month deadline for Department of Interior to promulgate endangered-species rule even where it was impossible for Department of Interior to comply with statutory deadline).

That said, whether to excuse compliance is beside the point in this case.  Plaintiff has not asked the Court, pursuant to 5 U.S.C. § 706(1), to "compel agency action unlawfully withheld or unreasonably delayed."  Rather, Plaintiff asks the Court, pursuant to sections 706(2)(A) and (2)(C), to "hold unlawful and set aside" the Decision as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  Accordingly, the sole question before the Court is whether BLM may lawfully direct its employees to wait ten years to "immediately" remove excess horses that BLM has determined must be removed.  BLM may not.

In this regard, *W. Rangeland*, on which BLM relies, supports this holding.  In that case, a group of ranchers argued, under section 706(1), that the court should compel BLM to more expeditiously remove a group of wild horses that BLM had determined were excess.  Although *W. Rangeland* declined to grant such injunctive relief, it agreed the "[t]he term 'immediately' must mean *something*—its presence in the statute necessarily places some temporal limits on any discretion BLM has to plan and execute removal actions."  265 F. Supp. 3d at 1284.  In light of the plain meaning of the statute (and also in consideration of Congress' desire to balance wild horse protection with ecological interests), the Court agrees with *W. Rangeland* that "immediately" must be construed to mean that "BLM may only delay necessary removal actions insofar as delay is necessary to plan and execute the actions safely and effectively."  *Id.* at 1285.  A phased, ten-year plan strikes the Court as far beyond the time permitted under the WHBA, particularly where BLM has conceded that "nowhere does [it] propose that it will need all ten years to achieve AML in the first instance."  Defs.' Repl. at 3.

The other authority on which BLM relies is unavailing.  For example, neither the Ninth Circuit in *Friends of Animals v. Silvey* nor the court below addressed the argument that a "phased"

gather plan exceeds the WHBA's requirement that BLM "immediately" remove excess horses. *See* 820 F. App'x 513, 517; 353 F. Supp. 991, 1007 (D. Nev. 2018).  Even if they did, these cases are not binding on this Court.

In any event, it appears only one court has confronted this question and definitively accepted the argument that "immediately" permits a decade-long "phased" gather plan.  *Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 59 (D.D.C. 2021).  In support of this holding, that court relies mainly on the following metaphor:

> [R]equiring immediate action so as to achieve something is not the same thing as immediately achieving the goal.  One might immediately stop eating dessert 'so as to achieve' a five-pound loss of weight.  But that does not mean that the moratorium on desserts begins and ends on day one.

*Id.* at 60.  On this Court's reading of the statute, this metaphor is less convincing.  First, extending the metaphor, "immediately achieving the [weight loss] goal" is *precisely* what the statute requires. The WHBA provides that, upon making an excess and action determination, BLM "shall immediately remove excess animals from the range so as to achieve appropriate management levels."  "Shall" imposes a mandatory duty; BLM must immediately remove the excess, no matter how difficult the task.  *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (discussing the term "shall" generally in statutory construction).  It would be an absurdity to conclude that "immediately" means the very day after an excess and action determination, but it does mean as expeditiously as humanly possible.  *See supra* at 13; *Am. Horse Prot.*, 694 F.2d at 1316-17.  Particularly given BLM's concessions in its briefing, ten years in this instance simply cannot mean, as a matter of the plain language of the WHBA, "immediately."  As a ten-year "phased" plan exceeds, in this case, BLM's discretion under the WHBA, the Court remands the Decision to BLM for reconsideration.

Because this remand concerns the duration of the "phased" plan, the Court shall not reach Plaintiff's argument that a ten-year duration means that BLM does not consistently rely on "current" information when executing a gather plan.

## B.  NEPA Claims

The Court applies the same standard to a NEPA claim as it does a WHBA claim. *See Wildearth Guardians v. Zinke*, 368 F. Supp. 3d 41, 58 (D.D.C. 2019).  An environmental assessment "is reviewed to ensure that the agency took a hard look at the environmental consequences of its decision to go forward with the project." *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (cleaned up).  The degree of analysis required for a "hard look" depends broadly on the totality of the circumstances, *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 149-50 (D.D.C. 2012), and the analysis must permit the agency to come to a "fully informed" and "well considered" decision, *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).  As opposed to an EA, an EIS is required only if substantial questions are raised over whether the proposed action "may cause significant degradation of some human environmental factor." *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009).  "When an agency is evaluating scientific data within its technical expertise, an extreme degree of deference to the agency is warranted." *Friends of the Earth v. Haaland*, --- F. Supp. 3d ---, 2022 WL 154526, at *5 (D.D.C. Jan. 27, 2022)*.  As such, the Court must not "'flyspeck' the [agency's] analysis for 'any deficiency no matter how minor.'" *Sierra Club v. FERC*, 827 F.3d 36, 46 (D.C. Cir. 2016) (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011)).  Instead, NEPA's mandated "rule of reason" provides that an agency's determination suffices unless its "deficiencies are significant enough to undermine informed public

comment and informed decisionmaking." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

As discussed above, Plaintiff raises three NEPA claims in this case.  In Count III, Plaintiff argues that BLM should have, but did not, prepare an EIS before issuing the 2019 Gather Plan. *See* Compl. ¶¶ 141–44.  Relatedly, Count IV alleges that BLM failed to adequately "consider a reasonable range of alternatives" before issuing the 2019 Gather Plan, *id.* ¶ 146, and Count V faults the agency for failing to take a "hard look" at the "cumulative, and site specific effects of the decision to continually roundup, permanently remove, castrate, and/or administer fertility control to wild horses and burros from the Twin Peaks HMA for a ten year period," *id.* ¶ 150.

More specifically, Plaintiff argues that:

(1) BLM's decision to return castrated horses to the range involves unique and unknown risks that are also highly controversial and therefore warrant preparation of an EIS, Pl.'s Mot. at 31;

(2) The "fertility control applications" referenced in the 2019 Gather Plan will "have significant impacts on both a changing landscape and a protected species," *id.* at 30;

(3) BLM failed to "consider the possibility that less aggressive management of wild horses, and more tolerance of natural processes" could achieve the desired result, instead of animal removal, *id.* at 44;

(4) BLM violated NEPA when it "fail[ed] to take a hard look at the unique risks of a combination of ten years of incessant roundups, unlimited fertility control applications, and dangerous sterilizations,"

*Id.* at 38.

The Decision considered and rejected all of these arguments. BLM determined, based on scientific analysis and population monitoring, that the population of horses in Twin Peaks in 2019 was 530 percent over low AML, and 720 percent over low AML for burros.  TP 23.   Removal, therefore, was necessary.  In concluding that removal was necessary, BLM's EA considered the cumulative impacts to cultural resources, TP 58, livestock, TP 59, vegetation, TP 60, riparian areas,

TP 61, soils, TP 62, and wildlife, TP 63.   The record is replete with scientific discussion on the consequences of the fertility controls at issue in Twin Peaks,[2] and the Court joins two other district courts that have concluded on similar records that no EIS was required after detailed review in an Environmental Assessment.  *See Am. Wild Horse Campaign v. Zinke*, 353 F. Supp. 971 (D. Nev. 2018) *aff'd sub nom. Am. Wild Horse Campaign v. Bernhadt*, No. 18-17403 (9th Cir. July 2, 2020); *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991 (D. Nev. 2018) *aff'd* No. 18-17415 (9th Cir. July 2, 2020).   Relying on additional scientific studies, BLM also considered, and rejected, the argument that a phased, ten-year approach would have overly detrimental effects on Twin Peaks and its horse and burro population.  *See* TP 216.[3]  It is also clear the BLM closely considered a range of alternatives to the Decision, weighed the costs and benefits of each alternative after notice and comment, and nevertheless chose the course of action in the Decision.  *See* TP 34-37.  On this record, it is clear that BLM took a hard look at the environmental consequences of the Decision before proceeding.

## C.  Remand

"The ordinary practice . . . is to vacate unlawful agency action."  *Standing Rock Sioux Tribe v. U.S Army Corps of Engs.*, 985 F.3d 1032, 1050 (D.C. Cir. 2021).  At the same time, "[a] court is not without discretion to leave agency action in place while the decision is remanded for [reexamination]."  *Id.* at 1051.  The decision whether to remand without vacatur depends on whether "'there is at least a serious possibility that the agency will be able to substantiate its decision,' and [whether] 'vacating would be disruptive.'"  *NAACP v. Trump*, 298 F. Supp. 3d 209,

---

[2]  *E.g.*, TP 30; TP 198; TP 201-05; TP 244-50; TP 256.
[3]  This issue may also be mooted by the Court's remand.

244 (D.D.C. 2018) (JDB) (cleaned up) (quoting *Radio-TV News Directors Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999)).

Here, BLM's legal error is relatively minor.  The Court has determined that BLM has otherwise appropriately substantiated its Decision under both the WHBA and NEPA.  This finding, which has met legal requirements, means that vacatur of the Decision would harm the ecological interests that the Decision is necessary to protect.  Additionally, given BLM's concessions, it appears likely that BLM can both accomplish its statutory duties while reducing the time period for the completion of those duties.  In other words, with BLM having made sufficient findings, and pursuant to the WHBA, the Court agrees that "the endangered and rapidly deteriorating range cannot wait," including in Twin Peaks.  *See Blake*, 837 F. Supp. at 459.  Accordingly, the Court will remand without vacatur.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's [23] Motion for Summary Judgment, **GRANTS IN PART AND DENES IN PART** Defendants' [24] Cross-Motion for Summary Judgment, and **REMANDS** this matter to BLM for further consideration in light of this Memorandum Opinion.

An appropriate Order accompanies this Memorandum Opinion.

**Dated**:  June 28, 2022

/s/
_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
